Case number 226040, Jervis Middleton v. Lexington-Fayette Urban County Government at All, argument not to exceed 15 minutes per side. Mr. Aguiar, you may proceed for the appellant. Good morning, everyone. Good morning. Sam Aguiar here on behalf of the appellant, Jervis Middleton. Officer Middleton has presented four issues for appeal and we don't have much time, so I would ask if there's one that any of you would like me to start with and focus on, I'm happy to go there, otherwise I can just try to go sequentially. I do have one question. Could you give me a sense of the specific instances of racial discrimination that Mr. Middleton pleads to support a hostile work environment claim for events arising after the 2019 settlement agreement? So there were not any after 2019. Okay. So basically when we go through the factual timeline, the crux of our appeal as it relates to that issue is the plain language of the release agreement. And the question, I guess, before the panel will be is, you know, did the district court adopt a broad or their adoption of that broad interpretation where it released any and all claims that Officer Middleton could have had leading up to that point? Was that accurate? Or is our position that it was a very broad and encompassing release with relation to claims associated with the disciplinary investigation only, the correct interpretation? Okay. So if, in fact, we agree that the settlement would cover hostile work environment prior to the settlement, then you're out the window on hostile work environment. That's correct. On the other hand, if we have a, I think, no, you're right, that it was a narrow scope, then we can have your valid hostile work environment would survive the settlement. That's correct. We think the district court erred when they stopped at any claim of any nature whatsoever in looking at the release and then not looking at the same, that language, that same sentence finishes with arising out of his demotion and associated disciplinary investigation. So we do believe that at least the plain language there and all the reasons that we've set forth, the proper interpretation of that agreement should be to release any claims associated with that investigation. And frankly, we agree if there was any sort of confusion within the briefings as to whether or not there's a disparate treatment claim being made associated with that specific 2019 disciplinary investigation, we're not making that, to be clear. So any context that was given as it related to the disparate treatment claim in which we talked about the 2019 treatment of Officer Middleton, that was given for purposes of the 2020 investigation, if that makes sense. We're not trying to get the court to go back in time to 2019 and validate this release for purposes of supporting a disparate treatment claim. We're not making any claims as it related to 2019 disciplinary investigation. Okay, so your disparate treatment claims relate to the final discharge. And you're claiming there were two comparators, right? This Adam Ray and Joe Williams? We've actually claimed, those are two that we've claimed. I think the court, we went into detail with them. There was actually ten. The district court summarily dismissed eight of them on the basis of the disciplinary history of each. And we did take issue with that in our briefings and said that we're not aware of any authority that would permit the district court to summarily dismiss them as comparators solely because there's not a record of them having a similar disciplinary history. But, long answer to an easy question, we did specifically go into significant detail as it related to Williams and Ray. And I don't see where Ray helps you much, frankly, because he resigned. He retired right before he was disciplined for his second act. So with Ray, he had the license plate issue that went back into time. I think there was three acts with him. But, yes, he did resign. Well, he was actually, on that one, he was actually, he didn't resign. He was allowed to retire on disability. It's hard then to say he was treated disparately. That's fair. Williams, yeah, he was given a one-day suspension for his second violation, right? Right, and we have issues with that. And you're claiming that he was comparable. We're claiming that he was comparable, that his second issue related to dissemination of information. And like we've gone into detail here, Officer Middleton was one of only two officers that's ever been terminated in the documentation that we can see from Lexington Police Department. And it's tough with the disparaging, you know, disparaging communications claim because, as we've cited, a lot of those are handled at the bureau level. But we were able to carve out, Lexington did produce for us 45,000 pages worth of internal investigations for us to comb through. And we were able to carve out what we could. Why do you think, though, that Williams' second act was comparable in severity to your client's? I mean, it was what, a mem of a female officer with a phallic symbol was what Williams did. Yeah, holding a phallic symbol, a picture of a penis with the chief. Right, all right. But what your client was accused of is turning over names and details of the officers involved in the protest to your client's sister, right? Well, it's a... Creating some danger to the department. Is that maybe a more severe problem that would justify a more severe punishment and not be a valid comparator, in other words, with Williams? Sure, if that was actually the case. But what he was suspected of and what the chatter was within the department, the record shows, is having done what you suggested, taking information, names, addresses, phone numbers of officers and disseminating it to his cousin who, in turn, was participating in the demonstrations. But the record actually shows that that's not what happened. The communications that resulted in his termination consisted of various statements, some of which went into frustrations he had within the department of officer misconduct, others of which were saying, hey, if you need something to say, you can say this guy's a racist, things along those lines. And then the other thing, just to make sure that I'm not omitting anything, was a screenshot of an email and a text message. The email stated that overtime was authorized during the demonstrations. The text message was a call out for the emergency response unit. Officer Middleton was on the emergency response unit. And it didn't go into specific details, but it did advise the recipient that the ERU had been called out. Is Williams the officer who stalked his ex-girlfriend? Yes. Apparently called dozens of times, sent offensive messages, showed up at her home, filmed her having sexual intercourse, spread rumors that she slept with a bunch of married officers.  Arguably just causing a great deal of disruption within the workforce. Yes. So these are not like unserious, if I can call that, acts that he took. I mean, these are pretty serious when it comes to morale within the workforce. They were, and it was actually a fellow police officer who was the female in that situation. That resulted in no discipline. And when we look at Officer Williams' subsequent actions that resulted in the one-day suspension, that's where I mentioned earlier, somewhat confusing, that we look at his disciplinary history in context with Officer Middleton based upon same or similar or more serious acts. And there are some similarities between Officer Williams and Officer Middleton's prior actions. We would certainly take the position that what Officer Williams did was far more serious. But at the same time, if the court's going to look for similar disciplinary history, I think it would be more than fair to look at the fact that Williams received none for that situation and sequence of events, whereas Officer Middleton had received substantial discipline for that. For the first incidences? Yes. That's when your client was demoted from sergeant, right? That's correct. Yeah. But we're really concerned with the second incident when he was fired. That's correct. Okay. For the purposes of the first incident, again, I know I'm probably not doing a good job articulating it, but we're not trying to make any sort of claims with relation to the first incident. Because that's what was settled. That was what was settled, exactly. But when the court did look at disciplinary history, if they want to look at disciplinary history, we do think when juxtaposing Officer Williams and Officer Middleton for their respective incidents around the same time frame, it's appropriate to at least analyze that, if that makes sense. Do you think there's a difference between the similarity required of comparators at the prima facie case stage and at the pretext stage? Because you have to meet both, right? And the department came forward at step two and says we have this non-discriminatory reason for firing. And it seems to me that at our pretext stage, we say that the conduct must be substantially identical. And that seems more demanding to me under our case law than the similarly situated showing. It does, and that's tough language. You know, we had cited BOBO and some other ones, and we think that, you know, it's very difficult to sit here and take conduct and make it absolutely identical. But at the same time, here we also have policy language that we've cited that at least helps us categorize certain conduct. And that's why we went into detail with relation to disparaging communications or what's called conduct towards others, conduct towards the department, and dissemination of information. But I do agree. It's tough. I mean, when you hear language like identical, that is one of the reasons why we did ask to implore the court to look at that and take a real close look at that because it creates some inherent problems. All right. I'm out of time, so I thank you. May it please the court, counsel. My name is Derek Wright. I represent Lexington-Fayette-Urban County Government doing business as the police department and its police chief, Lawrence Weathers, individually. There were several claims brought up. It got narrowed down to First Amendment race discrimination and the harassment. The harassment issue didn't get resolved on the merits. It was based on this waiver issue. I would add to the discussion on that earlier that in conjunction with his disciplinary hearing, he filed a union grievance and made allegations of discrimination in that. As part of the union grievance process, you have to have a meeting with your immediate supervisor, with the chief, with HR. In that meeting, he talked about these incidents of discrimination, which was confirmed all predated his first discipline in 2019. And there was a secondary part of the disciplinary resolution, which he agreed to withdraw that agreement and that everything was resolved. So we cited that in the summary judgment motion. We put all those settlement documents together, both what they call the letter of conformity, which is the resolution of the discipline, and then there was a second agreement where they stipulated to the resolution of this union grievance. That's waiver. I also made an argument. I don't believe the district court got into this, but when you make a grievance and withdraw it, that implicates the employer liability element of a harassment claim. And I believe we've cited cases in our brief that says if somebody talks about these incidents but asks not to have it investigated, that that's not going to lead to employer liability. The whole point of the employer liability is, did you put the employer on notice to take prompt remedial action? And if you don't want the employer to do that, then there's no employer liability. So on the harassment issue, I think it's both a waiver issue, but also there can't be employer liability when there's a bound up in this agreement to withdraw the grievance that addressed all these things. Is that why you're saying the settlement agreement encompasses the hostile work environment claim? Yes. I think that the judge was correct in the sense that the whole settlement resolved the union grievance that brought these up. But even if we get into any kind of plain language of what exactly was there, it would still negate the employer liability element. Now the other two claims, First Amendment and race discrimination, they were resolved on the merits. We've talked mostly about the race discrimination on this. Opposing counsel mentioned that there were ten comparators that got rejected. I'd submit that a lot of those comparators related to the first discipline that's been settled and that there were only a handful that he put forward for the termination. And we talked about Ray and Williams. I believe Ray was an isolated incident, was impacting a small universe of people. With Mr. Middleton, there is a core truth about this case that he had two disciplinary actions and they both impacted lots of officers. His first discipline, and throughout the case he's argued, I had an affair, I got caught snooping on her, I got caught using law enforcement resources, and he uses Mr. Williams as a comparison. But Williams didn't get disciplined for that and neither did Mr. Middleton. The basis for his first discipline was misleading these other officers. What Williams didn't do but Mr. Middleton did, he was a sergeant assigned within the police chief's office, which carries a very high level of esteem, asking people to run license plate information. Asking people on this lady's, on his mistress's associates, asking them to do that, asking them to do extra patrols. In a couple of cases they asked why. And he said, well, my mother has a suspicious car. Not being honest about what was going on. You're saying it was an abuse of authority sort of claim with respect to Middleton but not Williams? That's correct. Maybe more to the point, especially for the First Amendment issue, is that these officers that were implicated in this were all interviewed by the Internal Affairs. It's called Public Integrity Unit, PIU. And we put in the record, I believe it's 87-2, where we pulled out the transcripts where they all said, I felt misled. I'm paraphrasing. Misled, I feel like I cannot trust him anymore. I believe there were 13 officers who expressed that feeling. That they felt like he had, as you said, Judge Larson abused his position and they didn't feel like they could trust him anymore. After PIU investigates that, it goes to Chief Weathers for a preliminary review. He refers it under the union process to what's called the Disciplinary Review Board. I believe there's five people on that. Some appointed under the union side, some under the command staff side. The Disciplinary Review Board thought that his first discipline warranted termination. And Chief Weathers is the ultimate decision maker in the department and he said, no, we're going to do a demotion. At the time there was a suspension, but the agreement dropped the suspension. And they let him back on the force, but damage had been done on that first discipline. And this all goes to the race discrimination comparator side. Williams, there's other officers who have interpersonal conflicts. In a department the size of Lexington, that's going to happen. People are going to say things to each other from time to time. But we had somebody in the chief's office holding the rank of sergeant who had them doing things that he didn't tell them what they were doing and 13 people interviewed said, I felt misled. I don't think I can trust you. That was the first disciplinary action. Approximately a year later, we have the protests. And there was, I believe it's called chatter or rumors about him liking social media messages of the protest organizer, Sarah Williams. But there's no evidence that any decision makers had went down that road. Chief Weathers, in fact, he's an African American. He marched with the protesters at one time. He respected people's rights. He said that. But what happened is the protest leader got arrested. Some people jumped over police barricades at the department. They believe she incited that through the phone. There was a warrant. They looked into it, both her messages on the phone and Facebook. And they saw the messages with Williams. And the PIU investigation report summarizes all this. There's a transcript we put in it to make this easy because of the data. And it lists all the conversations. And there were some conversations that would be fine between private individuals. But what bothered PIU, what was the problem, is that he was sharing confidential messages, ERU call-outs. He was sharing deployment for overtime and in riot gear. I believe Mr. Middleton, he downplayed the significance of it, but he admitted, I'm not supposed to be sharing those. As public affairs officer when he was, that would be the chief's office call. But he wasn't supposed to share those emails after he was demoted to patrol officer. And he was talking to Sarah Williams and saying, that's Tyson Carroll. That's Ryan Truex. Here's Brian Jarrett. He had an affair with, or an African-American had an affair with his wife. Why don't you get him for that? There's Jackie Newman. I've got some stuff on her. Let's give her some horn time. Some of these messages, and they're summarized in the PIU report, are identifying where he's communicating to the protest leader and wanting them to attack officers on the line, agitate them, provoke them, and providing information to encourage that, in the middle of not just one demonstration, but a series of demonstrations through a few weeks in the summer of 2020. And this is not the police just going out to a mass demonstration, like they've cited incidents where there's been UK celebrations. Those things last a day, and they're not targeting the police. These protests were targeting the police, and they found communications where he was trying to help provoke, antagonize, and cite that. And those messages crossed the line. They didn't discipline him for marching or for showing support. The second discipline was those communications encouraging that. And it goes back to the first discipline of he had damaged trust. People had lost confidence. And after his first discipline, where we had 13 officers involved, now we have a whole other set of officers who felt like they'd been betrayed when he was working with the protest leader to confront them face-to-face in the middle of ongoing demonstrations. So you think his conduct is of a different sphere than Williams' conduct when he was only given one day's suspension after the second offense? Absolutely, Your Honor. Because of the way that it's impacting multiple officers, and not just the conduct on this one instance, but you have a disciplinary history of two incidents where he's impacting detrimentally his relationships with multiple officers throughout the agency. And that's what separates him from Williams. Chief, so we have the PIU investigation, and I've cited, I believe it's in 87-1 and 87-2 is where I just put the excerpts of these interview transcripts where people expressed distrust of Mr. Middleton. That's the interviewed officers. We had two different disciplinary review boards. I think they had different people on them of approximately five officers, so that's ten more. So we were getting about two dozen officers of the department expressing dissatisfaction. And this all comes to Chief Weathers, and he recommends his termination. And Chief Weathers, there is a hearing. I believe it was 11 or 12 witnesses, 66-some exhibits, lasted all day before the city council. And Chief Weathers explains how this impacted the officers personally. He indicated he was monitoring the radio. He indicated at one point that he could see the undercover officers and was trying to figure out who they are. He denied that he was ever going to give the names. But you can tell from the messages that he was talking about that, and under the honest belief doctrine, there was sufficient evidence for the city, for the police department, to believe that if he had seen who those undercover officers were, he would have told her. So we had a day-long hearing to put all this before the council, and that's what they voted to terminate him on was that discipline. And again, we're getting into the realm of over 20 officers expressing a distrust and a lack of confidence in him. Well, with respect to getting back to Williams, and I'm not saying here that the conduct is similar, but I would think that Williams' conduct would have impacted more than just one officer. It would have impacted a number of officers. These allegations of this female officer sleeping with a number of married officers, I mean, just impacted just not one officer, right? It seems like it would impact a broader spectrum of the workforce. There may have been, I believe in that episode with him, there were a couple of different people who had some interpersonal relationships. And again, there's evidence of that happening in a force that large. I don't think, though, it was similar to Middleton's first discipline where they proved 13 officers were contacted by him to either run license plates or do patrols. The disciplinary history is a valid distinguishing factor under the similarly situated test. And so when you add those 13 plus what he did on the demonstrations, it's just not comparable in scope or scale to Williams or anybody else. You're probably going to have situations where people argue with each other and it will impact that group. But this impacted officers throughout the department. Okay, thanks. Can I ask one other actual question? This meme that Officer Williams circulated, did that circulate just within the department or did he post it somewhere available to the public? I think it circulated just within the department, I believe. And I believe she made a complaint, and that's how that got investigated and resolved with Mr. Middleton's memes. He's alleged that it involved him and scared white women. When I deposed him, he only recalled one, or they only had that one plus one other of him that he recalled of looking in a window, which involved peeping in a window, watching people watch a U.K. game. He didn't remember what the other memes were. A sergeant reached out to him about this and he said, are you okay, and Middleton said yes. So his memes at the time that they were going on, unlike this lady, he never made a complaint. In fact, he said he was all right on that issue. We didn't get the First Amendment, but just very briefly, public concern does not include attacks or inciting attacks. Pickering balance, there's lots of evidence of disharmony and disruption. And I would also mention that that First Amendment claim was just against Mr. Weathers individually. Qualified immunity applies, and as I've cited in my brief, qualified immunity is usually appropriate in the First Amendment Pickering balance in Congress. Thank you, Your Honors. Any rebuttal? Hopefully brief. Just to go back to this waiver issue, I think it's incredibly important because there was a lot of reference to this union grievance, and the union grievance that's being referenced here, Sergeant Middleton believes police officers' actions, including the severity of discipline, in contrast to prior disciplinary outcomes involving other officers, were discriminatory and based upon Sergeant Middleton's race. That is the full language of discrimination presented within the grievance. There's nothing more. So essentially what he's saying is during his 2019 disciplinary hearing, there has been disparate treatment towards me, where I'm being recommended for a three-month suspension, versus other officers in the past. There was no record of any sit-down where Officer Middleton went through the chronology that he went through here, laid it out, made it part of the grievance, and made the department sit down there and consider that as part of the consideration in negotiating this agreement. In fact, when Chief Weathers was deposed in this case, and remember he was part of that sit-down and that bargaining, he denied even knowing about this chronology of incidents. So that kind of falls flat on its face. Now, there was some evidence in this case through a deposition of Jervis' wife that she had sat him down after this disciplinary agreement, but before the 2020 incident, and said, hey, my husband's going through quite a bit in the department. He's got a history of discrimination. So we do kind of challenge the Chief's assertion to that regard. But regardless, the record's clear that there was not a discussion of this as part of the consideration or part of the bargain that was going on there. Ultimately, Officer Middleton got up on May 31st and decided to walk with demonstrators. It was a large demonstration in the city of Lexington. There was a post on social media the next day thanking the officer, the anonymous officer, who had the courage to walk. We've got the testimony that shows that after that, Lexington Police Department went through hours and hours of video, found out that it was him, and that's when the rumors started permeating the department. While there's a suggestion and the argument that no mistreatment, nothing disciplinary took place against Officer Middleton, until after certain messages were discovered. Respectfully, we think that's an issue of fact. I would disagree with the assertion that 20 officers had issues with Officer Middleton, and I would say that it may have been hundreds of officers that had issues with Officer Middleton because after he walked in this demonstration, the record shows that they found out that it was him, they were going to the Chief, they were permeating rumors that literally roll calls had to take place with Officer Middleton's lieutenant to say, stop it, this is unsubstantiated, it's hearsay, and none of it ended up being true. Ultimately, and then to go to these confidential shares, just to clarify, I have a lot of respect for counsel in this case. I think it was probably just a semantic thing, but he said that there were ERU call-outs that were shared and things along those lines. It was one. It was one. And it said that the ERU's respond to the ERU office tonight at 830. No context whatsoever. So in terms of the dissemination of information, our position is that, again, you have to look at the level of discipline imposed compared to the conduct in question. If the court accepts that these communications were insightful or things along those lines, there's guidelines for that within the policies. If the court accepts that this was dissemination of information, which we're not here to say that it's not, it was one email that said the ERU's being called out. There's no operationally sensitive information there, and ultimately the punishment's got to fit the crime, and here it just doesn't. Thank you all. May I ask you just one technical question? Yes. So you've hinged a lot of your argument on the settlement agreement, and if we were to agree with you, let's say we agree with you that the claims are not waived, what do we do now? Because you didn't really brief the hostile work environment claim here. You just said, well, the district judge was wrong to say that the settlement agreement waived this claim. You didn't say, and if it hadn't been waived, here's why I would win. So I did. I would agree to a certain extent. I spent a lot of time in this one and a lot of paper going through the factual background. I still wanted to make sure that it was very clear in the record, the history of what we would call, and then I did throw in kind of a paragraph there within the brief that did go into, the court didn't address this, but if it did, if this court looks at it, here's why we should prevail on, or this is why it should be an issue of fact for the jury. But I did not spend pages and pages briefing it. I would request that it get kicked back. We should remand if we were to agree with you. On that, absolutely. Thank you. Thank you.